IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 3, 2024 Session

**KATELYN TAYLOR v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Benton County**
**No. 20CR123PC    J. Brent Bradberry, Judge**
_____

**No. W2022-01739-CCA-R3-PC**
_____

Petitioner, Katelyn Taylor, pleaded guilty to two counts of first degree murder in exchange for concurrent sentences of life imprisonment.  Petitioner then filed a pro se petition for post-conviction relief claiming ineffective assistance of counsel, and that her guilty pleas were not knowingly and voluntarily.  After appointing counsel and holding an evidentiary hearing, the post-conviction court denied the petition, which Petitioner appealed.  After review, we conclude that Petitioner failed to prepare a sufficient brief in compliance with Tennessee Rule of Appellate Procedure 27(a)(7) and Tennessee Court of Criminal Appeals Rule 10(b), therefore, her issues are waived.  Additionally, after our review of the record, we conclude Petitioner's claims are without merit.  Accordingly, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which J. ROSS DYER and JOHN W. CAMPBELL, SR., JJ., joined.

Jasmine McMackins Hatcher, McKenzie, Tennessee, for the appellant, Katelyn Taylor.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Neil Thompson, District Attorney General; and Jennifer Hedge, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

I. Factual and Procedural History

The Benton County Grand Jury returned an indictment against Petitioner charging her with two counts of first degree murder.  She subsequently pleaded guilty to both counts.  The facts of this case, as established from the record, are as follows.

On Sunday, March 22, 2020, at about noon, Petitioner contacted her friend John Bart Johnson and requested him to pick her up at a laundromat. When Mr. Johnson met with Petitioner, he noticed a cut on her finger. Mr. Johnson stated that Petitioner told him that she got into an argument with her grandmother and that her grandmother "came at her with a knife, so [Petitioner] got cut." Mr. Johnson took Petitioner to a hospital the next morning.

On March 23, 2020 Celeste McDaniel failed to arrive at her job. Ms. Maness, her co-worker, described Mrs. McDaniel as "very dependable" and stated that "she never missed" work. Worried, Ms. Maness tried to reach Mrs. McDaniel on her cellphone and Eugene McDaniel, her husband, on their house phone. Unable to reach them, Ms. Maness then went to visit their home, and after seeing their cars still there, she knew something was wrong. At 7:58 a.m., Ms. Maness called 911 and requested a welfare check for the McDaniels.

Camden police then proceeded to the McDaniel home and, after inspecting the exterior of the house and announcing their presence, entered it through a back door. Once inside, they immediately discovered the bodies of the victims, Mr. and Mrs. McDaniel, who were Petitioner's grandparents. Petitioner, who lived with the victims at the time, was absent. Police found two bullet holes on the front of the house, a revolver on the floor in the kitchen, and several guns in a gun cabinet next to the kitchen. They also found a large kitchen knife with a broken tip in a dish rack. A neighbor gave police a bullet fragment that another neighbor had found while feeding her dog outside directly across the victims' residence. Another neighbor reported hearing "a loud boom similar to a gunshot noise" on Saturday, March 21, 2020, around 10:30 p.m.

Officers developed Petitioner as a suspect in the victims' deaths. Ms. Maness explained that Petitioner's grandmother used to give Petitioner money, but once the grandmother found out that Petitioner was using drugs, she stopped giving her money and they began getting into arguments that often became physical.

Officers later located Petitioner at her friend Mr. Johnson's home. Petitioner had "reddish[,] brown stains on her shoes," and officers found a "purple ladies medium t-shirt with reddish, brown stains on the right sleeve inside a purse." Also, within the purse, they found Petitioner's Social Security card.

Petitioner was arrested for the victims' deaths. She initially denied shooting the victims and claimed they were alive when she left the house; however, after Petitioner was incarcerated, she made multiple incriminating statements to fellow inmates with details that only the perpetrator could have known. To one inmate, Petitioner claimed she got into

- 2 -

an argument with her grandmother. When her grandmother tried to take Petitioner's phone, she shot both victims and "finished them off" with a knife.

*Guilty Plea*

On December 17, 2020, Petitioner pleaded guilty as charged to both counts of first degree murder pursuant to a plea agreement with the State. In exchange for her guilty pleas, Petitioner received concurrent sentences of life imprisonment with the possibility of parole. The trial court conducted a plea colloquy with Petitioner, and placed her under oath. Petitioner stated that she understood her right to plead not guilty and proceed to trial, her right to confront witnesses and cross-examine the witnesses at trial, and her right against self-incrimination. Petitioner assured the trial court that she was waiving those rights. Petitioner stated she was freely and voluntarily entering pleading guilty, and that she had discussed the matter and possible legal defenses fully and thoroughly with her counsel. Petitioner acknowledged the plea agreement she reached with the State, and that she knew the range of sentencing that she faced. The State said the following as a factual basis for the guilty pleas:

> The State is prepared to prove that if we went to trial, on, or about, March 23[] of 2020, here in Benton County, in Camden, Tennessee, that [Petitioner] did intentionally kill Celeste Holland McDaniel, thereby committing the offense of First Degree Murder, in violation of [Tennessee Code Annotated section] 39-13-202.
>
> And the State would expect to prove, if we went to trial, that on, or about, March 23[], 2020, in Camden, Benton County, Tennessee, that [Petitioner], did intentionally kill with premeditation, Eugene McDaniel, thereby committing the offense of First Degree Murder, in violation of [Tennessee Code Annotated section] 39-13-202.

Petitioner agreed that the State's factual recitation was essentially true and correct, and the trial court accepted her guilty pleas. Petitioner was nineteen years old when she pleaded guilty.

Less than six months after pleading guilty, Petitioner timely filed a pro se petition for post-conviction relief, claiming she received the ineffective assistance of counsel, and that her guilty pleas were not knowing and voluntary made. After finding that Petitioner had alleged a colorable claim in her petition, the post-conviction court appointed counsel to represent Petitioner and conducted a hearing on her claims.

*Post-Conviction Hearing*

At the post-conviction hearing, the two attorneys who represented Petitioner in the trial court, Counsel and Co-counsel, testified. At the time of the hearing, Counsel had been with the public defender's office since 1992, and in 2017, he was appointed as the Twenty-Fourth Judicial District Public Defender. Counsel testified that his office was appointed to represent Petitioner on March 25, 2020.

Petitioner was originally charged in March 2020 with criminal homicide via an arrest warrant, and Counsel said that the warrant did not specify the particular homicide offense that Petitioner was accused of committing. Counsel thought that the reference to the general offense of homicide was "odd," but he believed that the issue with the charges "would kind of work itself out in a preliminary hearing." Counsel (and later Co-Counsel) said that it was not uncommon to see charging instruments amended from the time of the original arrest to the time of the indictment. Counsel also explained that in these types of cases, it is common to have defendants evaluated for competency, and Petitioner was no exception. Counsel read the results of Petitioner's competency evaluation into the record, in which the doctor opined, "at the time of the commission of the acts constituting the [offense], [Petitioner] was able to appreciate the nature of wrongfulness of such acts."

Counsel said Petitioner wrote letters to him, the District Attorney General, and the editor of the local newspaper. Counsel went "[n]umerous times" with Co-Counsel to visit Petitioner and told her "to stop communicating" with people not part of her legal team, because the communications were not "privileged." On November 27, 2020, Petitioner wrote to Counsel acknowledging that she understood she was charged "with two counts of first degree murder." Noting that the "holidays" were near and that she wanted closure for herself and her family, Petitioner said that she would "agree to a plea agreement of guilty on an insanity plea" in exchange for a sentence of "life with parole." Petitioner acknowledged that she would "be sent to prison," and she hoped to "help save" the costs of a trial by pleading guilty. She said that she would be "writing to the [District Attorney General's] office in a couple of weeks" unless Counsel contacted her. Around the same time, Petitioner wrote to TBI Special Agent Joseph Hudgins and said she was "willing to answer any and all questions regarding [her] case" if she received "a life with parole offer." Petitioner then asked for a "plea agreement in writing" and said that she would "cooperate 100%." Counsel was informed of this letter.

Eventually, the State sent a written plea offer for Petitioner to plead guilty to two counts of first degree murder. Counsel explained Petitioner's "sentence would be life with the possibility of parole and that she would proffer" a truthful account of what happened on the night of the incident. The plea offer also dictated that if Petitioner "tried to sell the rights" to her story, any "profit" that she made "would go to St. Jude's." Counsel visited

Petitioner in jail and "discussed that offer with [Petitioner], the pros, the cons, everything about it, and [Petitioner] was adamant that that's what she wanted to do."[1]  Regarding a discussion of the death penalty, Counsel explained:

> I was very clear with her the ranges that she stood in that day, on a Friday, and again, I said it on the record the day she pled.  I was very clear with her, she was not subject to the death penalty, as she stood that day. Whether it was First or Second, it didn't matter.  She was not—It was not a death penalty case at that time.

The State did not file a notice to seek the death penalty.  Counsel recalled telling Petitioner that the death penalty "was never on our table," and said that he never intended to make Petitioner believe that the State intended to seek the death penalty.

Counsel said Petitioner signed the plea agreement on December 11, 2020, and she pleaded guilty on December 17, 2020.  Counsel explained that the gap between her signing the agreement and pleading guilty provided her with time to fully reflect on her decision. Counsel testified Petitioner did not appear fearful, distraught, or emotional on the date that she pleaded guilty.  He said there was nothing concerning about her demeanor or behavior, and she did not appear to be under the influence of drugs.

Co-counsel testified that in April 2020, Petitioner obtained Co-counsel's cell phone number and began sending him text messages while she was incarcerated.  Some of the things that Petitioner texted Co-counsel made him "question her motives," and he felt uncomfortable being alone with her "not knowing what she later might possibly say occurred in that room when there w[ere] no other witnesses."  In one of Petitioner's text messages she stated, "Pretty sure you are my ex-boyfriend."  He, therefore, stopped going to visit Petitioner alone.

Co-counsel testified that he represented Petitioner at the preliminary hearing in June 2020 where the general sessions court found probable cause to bind over charges of second degree murder against Petitioner to the Grand Jury.  The State later obtained an indictment against Petitioner in October 2020 charging her with two counts of first degree murder.

Co-counsel stated that the defense team considered multiple defense theories to pursue, including a theory that someone else was responsible for the crime.  Co-counsel explained that when he and Counsel learned of the statements Petitioner had made to other inmates, it was "extremely devastating" to the defense.  Co-counsel said that he never had a conversation with the State about the possibility of the State seeking the death penalty,

---

[1] Counsel testified that he visited Petitioner alone because, at the time, Co-counsel was on vacation.

and he "never discussed the death penalty" with Petitioner. He testified that Petitioner never asked about the possibility of receiving the death penalty and never seemed concerned about the issue. Rather, he said that Petitioner never appeared concerned about anything "[o]ther than getting out of jail."

Special Agent Joseph Hudgins, Jr. testified that he began working for the TBI in April of 2018. He obtained search warrants for the victims' home, cell towers, cell phone records, and Mr. Johnson's camper. Agent Hudgins, along with another TBI agent, also conducted two interviews with Petitioner on March 23, 2020. The first interview was at 12:40 p.m. and Petitioner declined to sign the *Miranda* waiver and refused to speak without an attorney. A few hours later, around 3:45 p.m., Agent Hudgins served Petitioner with her arrest warrants and read the affidavit to her with no "intention" to "interview her further," but she began making voluntary statements to him. Agent Hudgins stated that he did not advise Petitioner of her rights again and explained "[s]he knew her *Miranda* rights at that point. She had already seen her rights, read the form, and she agreed to stay and make voluntary statements to us. We told her over and over, you'd asked for an attorney earlier, and she still kept making statements." He stated that during this time, Petitioner "understood the severity of the situation, and she was trying to present scenarios for possible outcomes of every situation that she brought up." Petitioner made a number of inconsistent statements and comments during the second interview. For example, Petitioner initially stated that she had no idea what happened to the victims, adding she "did not know they were dead," but later stated, she killed them in self-defense. She also alleged that she had been diagnosed with methamphetamine psychosis, but when asked about her drug use, Petitioner replied, "I don't shoot up or anything like that[.] I'm not a junkie by any means." Finally, Petitioner first denied having handled a firearm within the past ten years before admitting to the shootings.

On November 27, 2020, Agent Hudgins was forwarded a text message from Petitioner that stated:

> This is [Petitioner] could you please let TBI agent Joe Hugins [sic] Jr know I would like to speak with him about the murders of [the victims]. I am still in jail in Benton County. Thank you and God bless[.]

Agent Hudgins stated that once he received the message, he notified the district attorney general's office and asked the Benton County jail supervisor to inform Petitioner that he, Agent Hudgins, would not speak with her in person because she was represented by counsel, and if she wanted to make voluntary statements, she could write a letter to him from the jail. When Petitioner received the agent's message, she "wrote down a two-page statement requesting a plea agreement." That letter was immediately provided to the prosecutor and Counsel. Agent Hudgins sent another message, the contents of which were

approved by the prosecutor, to the jail supervisor and instructed him to relay the message to Petitioner:

> [Petitioner], this is TBI agent Joe Hudgins. I've asked Sergeant Pinion to read you this message. Due to COVID 19, I can't meet with you in person. I have received your letter and have showed it to Assistant District Attorney who has sent a copy of it to your attorney, [Counsel], the Assistant Public Defender that represents you. I cannot promise you a plea agreement. Under the law, your attorney, the DA, and the Judge all have to review that. The district attorney is going to see what the [victims'] family thinks about the idea of it. I will tell you that if you are looking for any hope from the family to agree to life in prison then the best thing you can do is to write down the whole truth about what happened that day and pray the family is better able to understand the real and whole truth about why and how you killed [the victims]. Anything short of that I'm not interested in, and I am going to prove with forensic and electronic evidence at a jury trial. The family deserves to hear you say it. You need to do the right thing as a human being and allow the family to know the truth and why they had not one, not two, but three people missing from Thanksgiving this year including you. They deserve to know it. Write down the truth, however bad that may be, and pray the family will give you mercy. I will not contact you outside of your attorney but you can initiate any further contact with me by writing letters. Do the right thing.

Agent Hudgins made it clear that while Petitioner was asking for his assistance with a plea offer, he did not extend an offer to her. He stated that at no point did he instruct Petitioner as to the type of offer she should ask for.

Petitioner also testified at the hearing. She said that she had completed "[s]ome college" and "studied paralegal studies" until she switched to study psychology. Petitioner said she had worked around attorneys for "about a year" and was familiar with what goes on in a law office. Petitioner's competency was then discussed, and when asked about her "methamphetamine psychosis," she explained that the "records are definitely out there," but she acknowledged that no record confirming psychosis had been introduced. Petitioner discussed undergoing a forensic evaluation while she was incarcerated and explained that she "pretended" she was not under methamphetamine psychosis because her drug usage and mental health are "extremely embarrassing." She also admitted to lying about being married to a public defender, lying about never having handled guns inside the victims' house, and lying to the forensic examiner about her drug use.

- 7 -

Petitioner said that on the day she pleaded guilty, she "told the truth about anything [she] was asked," and she understood the charges to which she was pleading guilty. She explained, however, that the reason she stated in her petition for post-conviction relief that she was coerced was because Counsel told her that the State "was 100[%] going to come for [her] with the death penalty, so that's what led to all [her] actions." She stated, "I was advised by my counsel to say yes to all of the judge's questions so that the plea could be accepted so that I could avoid the death penalty." Petitioner conceded that the transcript of her plea colloquy reflected that Counsel had informed her that the State was not seeking the death penalty, but she claimed that Counsel had previously told her that the State was certain to seek the death penalty unless she pleaded guilty. She acknowledged that both of her attorneys had testified that she never asked about the death penalty, and Petitioner claimed that both attorneys were lying in their testimony.

The post-conviction court denied Petitioner's claims in a detailed written order. The court credited the testimony of Counsel and Co-counsel and described them as "competent attorneys." The court described Petitioner's testimony as "self-serving," and ultimately "unpersuasive." The court found that Petitioner was "intelligent enough" and "familiar enough with the criminal justice system to fully understand her guilty plea." The court listed twelve reasons given by Petitioner to show that she had "numerous reasons to enter the plea." The court found that Petitioner "failed to prove by clear and convincing evidence that her plea was not knowing and voluntary." Additionally, the court found that at no time did Petitioner present "alternative theories or defenses for her attorneys to investigate." Consequently, Petitioner failed to show that "but for the alleged errors by [Counsel] and [Co-counsel], she would have insisted on going to trial." The court concluded that Counsel and Co-counsel did not act in a deficient or ineffective manner because "it was objectively reasonable for [them] to present the State's offer to [Petitioner], to inform the State that she accepted the offer, and to explain the process to [Petitioner] before and during entry of her guilty plea." Further, the court reasoned that even if it concluded that counsels' performance was deficient, Petitioner failed to show by clear and convincing evidence that she was prejudiced.

Petitioner's timely appeal of the post-conviction court's order followed.

## II. Analysis

Petitioner argues that she received the ineffective assistance of counsel and contends that her guilty pleas were not knowingly and voluntarily made. The State argues that Petitioner has waived these claims because she has not cited to the record in support of her arguments. We agree with the State.

Tennessee Rule of Appellate Procedure 27(a)(7) provides that a brief shall contain an argument setting forth "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and *appropriate references to the record* . . . relied on." (emphasis added). Our court's rules say the same: "Issues which are not supported by argument, citation to authorities, or *appropriate references to the record* will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b) (emphasis added).

Our appellate review is "frustrated" by a failure to follow these rules. *Abbott v. State*, No. M2020-00500-CCA-R3-PC, 2022 WL 102607, at \*18 (Tenn. Crim. App. Jan. 11, 2022). Our court routinely has held that the failure to make appropriate references to the record or comply with the rules results in a waiver of the issue. *State v. Killebrew*, 760 S.W.2d 228, 231-33, 35 (Tenn. Crim. App. 1988) (waiving issues for failure to make appropriate references to the record); *Bledsoe v. State*, No. W2023-00361-CCA-R3-PC, 2024 WL 127028, at \*5 (Tenn. Crim. App. Jan. 11, 2024) (waiving the defendant's issues for failing to make a single reference to the record in the argument section and for failing to argue how the applicable law applies to the facts of his case); *State v. Moss*, No. M2021-00043-CCA-R3-CD, 2023 WL 1117795, at \*1-2 (Tenn. Crim. App. Jan. 31, 2023) (explaining that when a defendant "cites some applicable law in his brief, [but] he makes not a single reference to the record in the argument section, or anywhere else in his brief," he has "waived appellate consideration" of his issues), *no perm. app. filed*; *State v. Lynch*, No. E2019-00195-CCA-R3-CD, 2020 WL 1899611, at \*3 (Tenn. Crim. App. Apr. 17, 2020) (waiving issues for failure to include a relevant statement of facts, and failing to cite to authority). "[C]ompliance with the Rules of Appellate Procedure is expected." *Bledsoe*, 2024 WL 127028, at \*5 (first quoting *Lynch*, 2020 WL 1899611, at \*3; and then citing *Moss*, 2023 WL 1117795, at \*2).

Throughout Petitioner's twenty-page brief, she repeatedly refers to the proceedings below over a span of twelve pages, yet she does not cite to the record a single time. As noted by the State in its brief and conceded by Petitioner at oral argument, the record is voluminous, containing more than 700 pages of transcribed testimony and multiple volumes of exhibits. When the State's brief addressed possible waiver of Petitioner's issues because of her failure to cite to the record, Petitioner did not file a reply brief or any other pleading which included the appropriate citations. We recognize the gravity of this case, but weigh this consideration against the consequences of disregarding adherence to the Tennessee Rules of Appellate Procedure and the rules of this court. In our compliance with those rules, we find Petitioner's brief inadequate. Consequently, we conclude that she has waived appellate consideration of her issues. Having concluded that Petitioner failed to comply with the applicable rules, she has waived the issues.

Despite Petitioner's waiver, our review of the record and applicable law reveal that Petitioner is not entitled to relief on the merits of her claims. A trial court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed on appeal under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, a trial court's conclusions of law—such as whether counsel's performance was deficient or whether that deficiency was prejudicial—are reviewed under a purely de novo standard, with no presumption of correctness given to the trial court's conclusions. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

Here, Petitioner raises two claims on appeal: (1) trial counsel was ineffective for failing to conduct an appropriate investigation; and (2) Petitioner's plea was not knowing and voluntary. Concerning Petitioner's claim that counsel was ineffective in investigating her case, the post-conviction court found that Petitioner "had ample time to confer with [trial counsel] about her options" and Petitioner created "any shortage of time by directly soliciting a [plea] offer from the TBI." Additionally, Petitioner failed to present any witnesses, experts, or evidence that trial counsel could have discovered or used and, therefore, cannot meet the burden required of her. *See Black v. State*, 794 S.W.2d 752, 758 (Tenn. 1990).

Finally, as it relates to Petitioner's claim that her plea was not knowing and voluntary, Petitioner testified under oath at her plea hearing that understood the rights she was waiving and was freely and voluntarily pleading guilty. A petitioner's representations and statements under oath that his guilty plea is knowing and voluntary create "a formidable barrier in any subsequent collateral proceedings [because] [s]olemn declarations . . . carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). Accordingly, Petitioner is not entitled to relief.

### III. Conclusion

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
MATTHEW J. WILSON, JUDGE

- 10 -